UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

OSCAR GONZALES, JR.,                    §
                                        §
            Petitioner,                 §
VS.                                     §        CIVIL ACTION NO. 2:14-CV-58
                                        §
WILLIAM STEPHENS,                       §
                                        §
            Respondent.                 §

## MEMORANDUM AND RECOMMENDATION

Petitioner Oscar Gonzales, Jr., is an inmate in the Texas Department of Criminal Justice - Criminal Institutions Division ("TDCJ-CID") and currently is incarcerated at the McConnell Unit in Beeville, Bee County, Texas.  The actions about which he complains occurred in Bee County, Texas.  Petitioner, represented by counsel, filed this petition pursuant to 28 U.S.C. §§ 2241 and 2254 on February 24, 2014.[1]  The underlying conviction which is the subject of the petition is a 2008 Bee County conviction for two counts of aggravated sexual assault, one count of indecency with a child by exposure and one count of indecency with a child by contact.  Petitioner claims that his constitutional rights were violated during the trial and appellate process.  Respondent filed a motion for summary judgment on July 31, 2014 to which Petitioner responded on September 29, 2014 (D.E. 28, 31).  For the reasons set forth below, it is recommended that Respondent's Motion for Summary Judgment be granted and Petitioner's Application for Habeas

---

[1] Petitioner stated under penalty of perjury that he placed his petition in the prison mail system on February 24, 2014 and it is considered filed as of that date.  *See Spotville v. Cain*, 149 F.3d 374, 376 (5th Cir. 1998) and Rule 3, Rules Governing Section 2254 Cases.

Corpus Relief be denied.  It is further recommended that any request for a Certificate of Appealability be denied.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1331.  Petitioner was convicted in Bee County, Texas.  28 U.S.C. § 2241(d); *Wadsworth v. Johnson*, 235 F.3d 959, 961 (5th Cir. 2000).

## BACKGROUND

### A.  Factual Background

Two girls, GA and BH, testified that on February 2, 2006, when they were both ten years old and in fifth grade, Petitioner exposed himself to them and asked GA to rub his penis as he masturbated.  Petitioner was the boyfriend of GA's mother and lived in the house with GA, her mother and her sisters.  BH was GA's friend and was spending the night at GA's house.  Earlier in the day, the two girls and GA's younger sister had discovered some *Girls Gone Wild* videotapes under the adults' bed and watched approximately five minutes of one, before putting it back (3 RR 37-39, 4 RR 18-19; D.E. 20-4 at 38-40, D.E. 20-11 at 18-19).[2]

GA testified that Petitioner suspected that the girls had watched the video because the other videos were in disarray under the bed.  He asked GA and BH if they had watched the video and when they confirmed that they had, he asked them if they had "felt anything" or had "[gotten] wet."  They told him they had not (3 RR 42; D.E. 20-4 at 43). Later that evening, Petitioner called the girls into the bedroom and showed them part of a

---

[2] "RR" refers to the Reporter's Record in this case.

video of two people having sex (3 RR 43-46, 4 RR 32; D.E. 20-4 at 44-47, D.E. 20-11 at 33).

The girls went to GA's room and while they were lying down, Petitioner entered the room and asked them if they had enjoyed the video.  Then he asked them if they wanted to see "a real one" or see sperm, pulled his pajama pants down and began masturbating.  He looked at GA in a way that made her think he was asking her to rub his penis, so she did.  She testified that she rubbed it because she did not want BH to have to do it and did not know what would happen if she refused (3 RR 46-47, 4 RR 40-41; D.E. 20-4 at 47-48, D.E. 20-11 at 41-42).  Petitioner ejaculated on himself and on GA's hand (3 RR 48-49, 4 RR 44; D.E. 20-4 at 49-50, D.E. 20-11 at 45).  Petitioner told GA and BH not to tell anyone and GA also made BH promise not to tell (3 RR 48-50; D.E. 20-4 at 49-51).  Petitioner told the girls that if they told the secret he would have to go to jail and asked them to tell him a secret in return (4 RR 45-46; D.E. 20-1 at 46-47).

BH became ill with a fever the following day and went home.  BH's mother testified that she had an overwhelming feeling that something was wrong with BH and after BH recovered from her fever, her mother told her a story about an uncle who had acted inappropriately with his stepdaughter (4 RR 229-232; D.E. 20-9 at 32-35).  BH then told her mother about watching the video tapes and about Petitioner exposing himself to the girls, masturbating, and having GA touch his penis (4 RR 232-234, 4 RR 51-52; D.E. 20-9 at 35-37, D.E. 20-11 at 52-53).

Following BH's outcry, her parents contacted law enforcement authorities (4 RR 244; D.E. 20-9 at 47).  During the course of the investigation, GA spoke to a forensic

interviewer.  In addition to talking about the incident with BH and Petitioner, GA told the interviewer that Petitioner had, on other occasions, touched her breasts and put a stick-like object in her anus (3 RR 144-145; D.E. 20-5 at 39-40).  According to the interviewer, GA described several incidents of sexual assault in great detail (3 RR 151-153; D.E. 20-5 at 46-48).

At the trial, GA testified that when she was in fourth grade, Petitioner had touched her in her "private areas" as often as twice a week (3 RR 26-27; D.E. 20-4 at 27-28).  She told her mother and when her mother confronted Petitioner, he denied having touched GA but also said he had been having blackouts from drinking  (3 RR 30, 198-200; D.E. 20-4 at 31, D.E. 20-5 at 93-95).  Petitioner had to attend court on another matter the day after GA's mother confronted him and ended up checking into an alcohol rehabilitation center for several months (3 RR 200-201; D.E. 20-5 at 95-96).

GA testified that when Petitioner was released from the rehabilitation program he returned to the house and shortly thereafter began to assault her once again by putting his penis in her vagina and anus (3 RR 31; D.E. 20-4 at 31).  GA did not tell her mother because she did not want to ruin her mother's relationship with Petitioner (3 RR 33; D.E. 20-4 at 34).

GA was examined by a sexual assault nurse examiner (SANE nurse), who noted no physical evidence of trauma to her vagina or anus (4 RR 24, 30; D.E. 20-7 at 25, 31).  The nurse testified that it is common to find no injuries in cases of sexual assault of children (4 RR 40; D.E. 20-7 at 31).

Petitioner testified that he never sexually assaulted GA and that her mother never confronted him about having sexually assaulted her (5 RR 211; D.E. 20-12 at 101).  He stated that on the occasion when BH spent the night, he had gone to bed early and GA woke him up and asked if she was going to get in trouble because she and BH had watched an inappropriate video.  GA said that her younger sister had told their mother that they had seen a video.  GA blamed BH who told Petitioner that it was not a problem because she and her sister watched the same type of videos (5 RR 215-217; D.E. 20-12 at 104; D.E. 2013 at 1-2).

Petitioner was concerned because he was on probation and he told GA's mother that they needed to call BH's mother and tell her the girls had watched the videos, but GA's mother was afraid the incident would become a source of gossip in their small town.  Petitioner called BH's mother but did not reach her.  He called her again, later, to tell her that BH did not feel well and wanted to go home, but her mother did not pick BH up until the next day.  Petitioner never told BH's mother about the videos, but he told BH not to say anything about the videos because he did not want the information to get out (5 RR 218-220; D.E. 20-13 at 3-5).

Petitioner testified that when he first moved into the house, the children had no manners, cursed at their mother, did not bathe and had lice in their hair.  He attempted to show them how to make their beds, be clean and be respectful of their mother and of each other (5 RR 226-227; D.E. 20-13 at 11-12).

Petitioner said he had pleaded to guilty to his previous offenses for driving while intoxicated and assault because he was guilty of those offenses.  But he did not plead

guilty to the charges involving the girls because he did not do anything to them (5 RR 229; D.E. 20-13 at 16).

## B.  Procedural Background

On February 22, 2007 Petitioner was indicted on two counts of aggravated sexual assault, one count of indecency with a child by exposure and one count of indecency with a child by contact (1 CR 2-3; D.E. 19-3 at 5-6).[3]  He was tried in front of a jury, which found him guilty on May 16, 2008.  Following a hearing on punishment, the jury assessed sentences of seventy-five years on each of the sexual assault charges, ten years on the indecency with a child by exposure charge and fifteen years on the indecency with a child by contact charge, with all the sentences to run concurrently.  In addition, Petitioner was fined $10,000 on each count, for a total of $40,000 (CR 237-240; D.E. 19-5 at 32-35).

Petitioner filed a direct appeal, and on June 24, 2010 the Thirteenth Court of Appeals affirmed his conviction.  *Gonzales v. State*, No. 13-08-410-CR, 2010 WL 2543908 (Tex. App. – Corpus Christi 2010, pet. ref'd)(located herein at *Ex Parte Gonzales*, WR-77,788-01, Event Date: 02/07/2013 at 20-41; D.E. 21-15 at 24-45). Petitioner sought a petition for discretionary review from the Texas Court of Criminal Appeals and it was refused on February 16, 2011 (D.E. 19-2).

Petitioner filed an application for habeas corpus relief in state court on January 5, 2012. *Ex Parte Gonzales*, WR-77,788-01, Event Date: 06/07/2012 at 2-16 (D.E. 21-17 at 6-20).  The trial court took no action and the petition was overruled by operation of law on March 9, 2012.  *Id.* at 236 (D.E. 21-19 at 17).  The Texas Court of Criminal Appeals

---

[3] "CR" refers to the Clerk's Record in this case.

remanded the application to the trial court on June 27, 2012 with instructions to make findings of fact and conclusions of law on the issue of whether Petitioner's trial and appellate counsel were deficient and if so, whether the deficiency prejudiced Petitioner. In addition, the trial court was instructed to make any other findings of fact and conclusions of law it deemed appropriate for disposition of the claim for habeas relief. *Ex Parte Gonzales*, WR-77,788-01, Event Date: 06/27/2012 (D.E. 21-21).

On July 16, 2012 the trial court ordered Petitioner's trial and appellate attorneys to file affidavits addressing claims made by Petitioner in his state habeas application. *Ex Parte Gonzales*, WR-77,788-01, Event Date: 08/02/2012 at  2 (D.E. 21-16 at 5). The attorneys did so and on October 25, 2012 the trial court entered findings of facts and conclusions of law recommending that habeas relief be denied. *Ex Parte Gonzales*, WR-77,788-01, Event Date: 02/07/2013 at 2-19 (D.E. 21-15 at 6-23). The Texas Court of Criminal Appeals denied the application without written order on January 29, 2014. *Id.* at cover (D.E. 21-15 at 2).

Petitioner filed his application for habeas corpus relief in this Court on February 24, 2014 and makes the following allegations:

(1) His due process rights were violated when the trial court created a hostile and unfair environment;

(2) His due process rights were violated when he was not allowed to present a complete defense;

(3) His right to confront and cross-examine witnesses was violated when he was not allowed to cross-examine two of the State's witnesses;

(4) His trial counsel was ineffective when he

(a) failed to hire an expert after telling Petitioner he was going to do so;

(b) failed to keep Petitioner apprised of the status of his case, including not telling him that no expert would testify on his behalf;

(c)  failed to timely challenge the State's expert;

(d)  failed to contact witnesses who could have testified on Petitioner's behalf;

(e)  failed to object to the State bolstering the complainant's testimony;

(f) allowed the State's expert to testify that "she gives it about 80/20 percent of what the child is saying is true;"

(g) failed to investigate witnesses who could have impeached GA's mother and exposed her motive for testifying;

(h) failed to assert due process and confrontation clause arguments with respect to cross-examination of BH's mother and

(i) failed to impeach GA's mother with respect to her family's prior involvement with Child Protective Services; and

(j) His trial attorney had a conflict of interest;

(5) His appellate counsel was ineffective when he

(a)  failed to properly raise two issues;

(b) failed to specifically state how the evidence was insufficient;

(c) failed to challenge the specific elements of the offense for the which he was convicted; and

(d) failed to cite to all the portions of the record that supported his appeal; and

(6) Petitioner is actually innocent of the crimes.

In the motion for summary judgment, Respondent argues that (1) Petitioner was not denied due process by an unfair or hostile trial court; (2) Petitioner's rights under the confrontation clause were not violated; (3) Petitioner received effective assistance from his trial and appellate counsel and (4) Petitioner has failed to meet the "actual innocence" standard.  Respondent concedes that the petition is timely and that Petitioner exhausted his state court remedies.

In response to the motion for summary judgment, Petitioner argues that a number of claims he made in is state habeas were not addressed by the state habeas court and thus "are not barred for federal review," citing *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and

*Harris v. Reed*, 489 U.S. 255 (1989).  Respondent does not argue that any of the claims are barred and all of Petitioner's claims are addressed on the merits under the standards set forth in the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2241-2255 (AEDPA).  Petitioner also reiterates the arguments in his petition that his constitutional rights were violated.

## APPLICABLE LAW

### A.  Standard of Review

Under the AEDPA, a state prisoner may not obtain relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) (West 1996).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or if the state court decides a case differently than the Court on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Williams v. Taylor*, 529 U.S. 362, 412-413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d (2000).  Although "unreasonable" is difficult to define, the Supreme Court

noted that it is an objective, rather than subjective, standard and emphasized that there is a critical difference between an unreasonable application of federal law and a merely "incorrect" or "erroneous" application of federal law. *Neal v. Puckett*, 239 F.3d 683, 687 (5th Cir. 2001)(citing *Williams*, 120 S.Ct. at 1522-1523).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)(quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A federal habeas court must determine what theories or arguments supported, or could have supported, the state court's decision. Then it must ask whether it is possible that fair-minded jurists could disagree that the arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *Harrington*, 131 S.Ct. at 786. Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).

The standard is very difficult to meet. "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court litigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." *Id.* "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-787.

If a decision by a state court is silent as to the reasons for the refusal, a federal habeas court can "look through" the decision and evaluate the last reasoned state court decision. *Bledsue v. Johnson*, 188 F.3d 250, 256 (5th Cir. 1999). A state court's factual findings are presumed to be correct and a petitioner has the burden of rebutting the presumption with clear and convincing evidence. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006)(citations omitted). This deference extends not only to express findings of fact, but to the implicit findings of the state court. *Id.* In addition, "where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S.Ct. at 784.

## B.  Creation of Hostile and Unfair Environment by Trial Court

The Due Process Clause requires that a defendant be provided a "'fair trial in a fair tribunal,'" before a judge "with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)(quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). However, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause establishes a constitutional floor, rather than a uniform standard. *Id.* Questions regarding judicial bias generally are answered by common law, statute or professional standards of the bench or bar. *Id.*

In *Liteky v. United States*, 510 U.S. 540 (1994), the Supreme Court heard an appeal of a conviction based on a trial judge's refusal to recuse himself. The defendant moved for recusal based on an earlier trial involving the same defendant where the

defendant alleged the judge had displayed impatience, disregard for the defense and animosity toward the defendants and their beliefs.  It also was alleged that the judge had interrupted the closing argument of one of the codefendants, instructing him to stop introducing new facts and to restrict himself to evidence already presented.  *Id.* at 542-543.

> In discussing the motion to recuse, the Court noted the following:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical, or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.  An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German American defendants:  "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty."  *Id.* at 28 (internal quotation marks omitted).  *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display.  A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555-556 (emphasis in original).  Petitioner described a number of comments by the trial court judge and exchanges between the judge and defense counsel that he argues showed that the judge was so biased that the proceedings were rendered unfair under the Due Process Clause.

### (1) Adverse Rulings

Petitioner argues that the trial court showed bias by ruling against him on several occasions.   However, judicial rulings alone, without surrounding comments or accompanying opinion, almost never constitute a valid basis for a bias or partiality motion because only in the rarest circumstances do they show the degree of favoritism or antagonism required.   *Liteky*, 510 U.S. at 555.   Petitioner argues that the following rulings showed bias against the defense:

### (a)  Batson Challenge

Petitioner asserts that during voir dire, the court granted the State's request for a shuffle of the panel even though his counsel argued that the State sought the shuffle only because there were a lot of Hispanic men in the first part of the panel, which was not a valid, race-neutral reason (2 RR 17; D.E. 20-2 at 18).   The granting of the motion, without any comment or accompanying opinion by the trial court, does not constitute bias or partiality under *Liteky*.

### (b) Refusal to Allow Cross-Examination of GA's Mother About Previous Encounter with Child Protective Services (CPS).

Petitioner's counsel asked to be allowed to cross-examine GA's mother about the investigation of her father (GA's grandfather) by CPS over allegations that he had sexually abused children.   Petitioner's counsel wanted to use the information to impeach GA's mother, who testified that CPS had never been involved with her family.   He believed it would show that she knew that CPS had the power to remove an adult from a

home and would support Petitioner's claim that the allegations were brought in an effort to get him out of the house (2 RR 12, 3 RR 221; D.E. 20-2 at 13, D.E. 20-6 at 13).

The court allowed Petitioner's counsel to question GA's mother outside the presence of the jury and she testified that her children could only be around her father if they were supervised by another adult, but she did not know if that order came from CPS, his attorney, or the prosecutor in his case.  She also said that all she knew about CPS was that it was the agency that could come and take away one's children (3 RR 258-264; D.E. 20-6 at 50-56).  Based on GA's mother's testimony, the court denied Petitioner's counsel's motion to impeach GA's mother about her testimony that she had previous experience with CPS (3 RR 265; D.E. 20-6 at 57).

The trial court showed no bias against Petitioner in making its decision.  To the contrary, the court listened to the evidence and made a ruling.  Petitioner's argument that the ruling showed bias or unfairness is not supported by the record.

### (c) Impeachment of BH's Mother

BH's mother was considered an outcry witness and testified about what BH told her that led to Petitioner's arrest.  Petitioner's counsel wanted to impeach her by having the jury hear from a man, Aaron Terry, who claimed that he had sex with BH's mother when he was fourteen, which would have been considered a sexual assault offense based on his age.  Petitioner's counsel argued that if Terry were allowed to testify about his encounter with BH's mother, it would expose BH's mother's bias, motive and interest in inducing BH to make an allegation against Petitioner.

14 / 45

The trial court found that the testimony was inadmissible under the rules of evidence and made no comments indicating any unfair bias against Petitioner (5 RR 191; D.E. 20-12 at 81).  Petitioner's argument that the court's ruling violated his right to due process is not supported by the record.

### (d) Referring to Petitioner as the "Perpetrator"

A witness referred to the Petitioner as the perpetrator and the following exchange took place between counsel[4] and the court:

> **Mr. Cantrell**:  Objection to the – objection to calling my client a "perpetrator." He is not a perpetrator; he is a defendant that's merely being accused.  I would object that the State allow her to call him a "perpetrator."
>
> **The Court**:  Overruled.
>
> **Mr. Cantrell**:  I vehemently –
>
> **The Court**:  I hear your objection.  Thank you.  Have a seat, Mr. Cantrell.  Thank you.  The Court has ruled.  Sit down.  Sit down.  Sit down.
>
> **Mr. Cantrell**:  Look, Judge. I have every right to make an objection.
>
> **The Court**:  And you have done so.  Sit down.

(3 RR 126-127; D.E. 20-5 at 21-22).  The trial court's comments do not show bias or prejudice against the Petitioner.  Rather, she overruled an objection and when Petitioner's counsel continued to argue, asked him to sit down.

### (e)  Did Not Allow Defense to Keep a Witness Subject to Recall

At the conclusion of the forensic interviewer's testimony during the State's presentation of evidence, Petitioner's counsel asked that she be excused subject to being

---

[4] Petitioner was represented at trial by Anthony Cantrell and Patrick Moran.

recalled during Petitioner's case in chief and the court denied the motion because the witness had plans to travel out of town the next day.  At a bench conference, Plaintiff's counsel said that they might want to examine the interviewer again after they called GA. The court told them that they had already cross-examined the interviewer and her testimony would not change based on what GA might later testify about (3 RR 184-187; D.E. 20-5 at 79-82).

Neither this ruling nor any of the others described by Petitioner showed bias or prejudice on behalf of the trial court.  Petitioner's arguments to the contrary are not supported by the evidence in the record.

### (2)  Demeaning Comments Made in Front of Jury

Petitioner contends that the trial court showed bias and prejudice when she demeaned his attorneys in front of the jury.  As an example, Petitioner cites the testimony of GA's mother when she was being questioned by the prosecutor about CPS removing GA and her sisters from the home.  The prosecutor asked, "Have you ever had Child Protective Services involved *in your life* prior to this?" to which GA's mother responded, "No."  (3 RR 214; D.E. 20-6 at 6)(emphasis added).  On cross-examination, defense counsel asked GA's mother if she wanted to "stick with" her answer to the prosecutor that CPS had never been involved in her family and she affirmed, stating that her only involvement with CPS was when they had taken her children after the investigation involving Petitioner had begun.  Petitioner's counsel then asked, "I'm not saying you; I'm saying your family.  The question was your family…" (3 RR 223; D.E. 20-6 at 15). The following exchange occurred:

**The Court**:  That wasn't the question, Mr. Moran.  I'll get you straightened out.  That wasn't the question earlier.

**Mr. Moran**:  Your Honor, with all due respect, I believe that was the question.

**The Court**:  No, it was not, Mr. Moran.  It wasn't.

**Mr. Moran**:  Our memories –

**The Court**:  "In your life."

**Mr. Moran**:  Our memories are different, Your Honor.  I'll move on.

**The Court**:  The jury probably remembers.

(3 RR 223-224; D.E. 20-6 at 15-16).  Petitioner argues that the court's comments were improper because she implied that his counsel was doing something wrong or misleading the jury.  However, at most these comments show impatience on the part of the court and do not show that the court was biased or prejudiced against Petitioner.

Another time in front of the jury, when the prosecutor was cross-examining Petitioner, the following exchange occurred:

**Prosecutor**:  And Kim said you were mad because you wouldn't go get any food for her.

**Petitioner**:  What it was, ma'am, is --

**Prosecutor**:  It's a simple yes-or-no question.

**Mr. Cantrell**:  No, it's not.  Let him explain his answer.

**The Court**:  She asked him "yes" or "no."  you may ask him to explain when it's your turn.  Thank you.

**Mr. Cantrell**:  You know, Judge --

**The Court**:  Mr. Cantrell –

**Mr. Cantrell**:  May I approach?

**The Court**:  No, sir.  Sit down.

**Mr. Cantrell**:  I'm not even going to be able to approach now?

**The Court**:  No.  You can ask the question when it's your opportunity.

**Mr. Cantrell**:  Well --

**The Court**:  Thank you.

**Mr. Cantrell**:  I'm trying to follow – excuse me – I'm trying to follow your rules by approaching.

**The Court**:  Mr. Cantrell, have a seat.

(5 RR 236-237; D.E. 20-13 at 21-22)

Once again, this exchange fails to show bias or prejudice on the part of the judge. Rather, it shows a stern judge's effort to administer her courtroom.

Petitioner also complains that on at least three occasions the court interrupted cross-examination by telling counsel he was asking repetitive questions and to move on. The trial court also commented that counsel's questions were confusing a witness and also twice admonished counsel for badgering a witness.  None of these comments, reprimands or conversations cited by Petitioner show bias under the *Lietky* standard. They show only a judge making an effort to manage the trial and move it along.

Petitioner also contends that the judge made a sarcastic remark to the jury, saying, "I love my job.  It's so fun."  In response, a juror said "Your honor, I think you need a doctor."  (5 RR 273; D.E. 20-13 at 58).  Petitioner asserts that this comment from a juror shows that the jury "was in tune to the environment while Petitioner was standing trial."

However, a review of the record shows that the comment by the judge did not appear to have anything to do with the parties and may have been in response to a person stuck in an elevator in the building (5 RR 273-274; D.E. 20-13 at 58-59).

### (3) Comments Made Outside the Presence of the Jury

Petitioner complains that while the jury was out, the prosecutor complained that defense counsel had played "a real dirty trick" with regard to a witness and the judge commented, "Well, that's sort of what defense counsel do, Ms. Warner, but anyway.  Go ahead."  (4 RR 212; D.E. 20-9 at 15).  Later in the conversation, the judge said to Mr. Cantrell, "So, you know, that is called a total delay tactic and I'm not saying anything's wrong with it.  I'm not telling you it's wrong."  (4 RR 214; D.E. 20-9 at 17).  The remark about defense attorneys, which arguably showed a lack of judicial temperament, demonstrated "generalized impertinence" rather than actual bias toward Petitioner and thus did not provide the kind of evidentiary support needed for an actual bias allegation. *Buntion v. Quarterman*, 524 F.3d 664, 673 (5th Cir. 2008).

Another time outside the presence of the jury, the judge threatened Moran with contempt if he did not "shush his mouth" and answer her question (5 RR 8; D.E. 20-11 at 9).  That admonition came after a confusing exchange regarding the timing of bringing a witness from the jail to testify (5 RR 7-8; D.E. 20-11 at 8-9).  The comment may have showed annoyance and anger, but it did not show bias or prejudice.

Also outside the presence of the jury, the trial court and defense counsel engaged in an exchange where the court chastised counsel for badgering a witness, for bringing a

*Daubert* challenge[5] in the presence of the jury and for failing to follow Texas Rule of Evidence 412, which addresses evidence of previous sexual conduct in a criminal matter. Defense counsel responded that the court had been belittling him and his co-counsel for the previous two days of trial and he argued that the court had improperly commented on his cross-examination. Cantrell said, "Now Judge, if you think I'm doing something wrong, ask me to approach and we can talk about it…" (4 RR 70-71; D.E. 20-7 at 71-72).

The court responded that the attorney would not stop talking when she was making her rulings and added the following:

> Unfortunately, I'm not the only court that you've had this opinion with and I hate to tell you that. When we make an objection, we make a ruling, if you would sit down and ask to approach, we'll be glad to. But no, you come back at us. You have no respect for the bench and that has been my problem. All right? I would not have to do this if you would respect my rulings or approach and ask me to approach. None of y'all do. Y'all just keep interrupting. I say something; you got to get the last word in. This is the courtroom. I'm in charge of the courtroom.

(4 RR 71-72; D.E. 20-7 at 72-73). Cantrell's co-counsel, Moran, expressed concern that the judge had had some sort of *ex parte* communication regarding Cantrell, but the judge said she was referring to other occasions where Cantrell had been in her courtroom. Moran also complained that the judge had shaken a finger at Cantrell as if she were admonishing a child (4 RR 72-73).

Petitioner argues that the exchange shows that the judge had a negative opinion from an extrajudicial source and that her comments and rulings revealed her antagonism toward Petitioner and his counsel. However, the judge denied having spoken to anyone

---

[5] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (2005), sets forth criteria by which a court assesses a proffer of expert testimony.

else about Cantrell and also apologized and said that if the attorneys would follow her rulings they "would not be having that issue."  (4 RR 73 D.E. 20-7 at 74).  Also in the same conversation, the judge admonished the prosecutor for a remark the prosecutor had made earlier in the day outside the presence of the jury and off the record (4 RR 74-76; D.E. 20-7 at 75-77).  The court then offered defense counsel an opportunity to take a witness on voir dire outside the presence of the jury and to have a *Daubert* hearing, but counsel declined (4 RR 76-77; D.E. 20-7 at 77-78).

It is unclear whether the trial court engaged in a conversation with another court about Cantrell's courtroom demeanor, but even if she had, her comments did not rise to the level of bias or prejudice as described in *Liteky*.  Rather, they are more properly characterized as "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display." *Liteky*, 510 U.S. at 555-556.

Based on the foregoing, Petitioner has failed to show that the trial court violated his constitutional right to a fair and impartial trial.  Accordingly, it is recommended that judgment be entered for Respondent on this issue.

## C.  Confrontation Clause and Right to Present a Complete Defense

Petitioner's arguments that his rights to due process and to confront and cross-examine witnesses were violated are addressed together.  The Sixth Amendment Confrontation Clause guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him.  The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.

*Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986).  Generally, a cross-examiner is not only permitted to delve into the witness's story to test perceptions and memory, but also is allowed to impeach or discredit the witness.  *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  One way to discredit a witness is to introduce evidence of a prior criminal conviction of the witness, which gives the jury a basis to infer that the witness's character is such that he is less likely than the average trustworthy citizen to be truthful in his testimony.  *Id.*

In addition, a cross-examiner may ask questions intended to reveal possible bias, prejudices, or ulterior motives of a witness as they may directly relate to issues or personalities in the case at hand.  *Id.*  "We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."  *Id.* at 316-317 (citing *Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)).

The trial court retains wide latitude to impose reasonable limits on cross-examination based on concerns about issues such as harassment, prejudice, confusion of the issues, a witness's safety, or interrogation that is repetitive or only marginally relevant.  *Van Arsdall*, 475 U.S. at 679.  Confrontation clause violations are subject to a harmless-error analysis.  *Id.* at 684.

**(1) Aaron Terry**

Petitioner argues that he was not allowed to present a complete defense because he was not allowed to present testimony from Aaron Terry to the jury that BH's mother, who was a teacher, had sexually assaulted him when he was a minor.  Outside the

presence of the jury, Terry testified that he had met Petitioner while they were both in jail and that after Terry was released from jail, he heard more about the charges pending against Petitioner.  Terry returned to jail and while there, had an opportunity to talk to Petitioner and told him about his sexual encounter with BH's mother while he was a minor.  Petitioner asked Terry to tell Petitioner's counsel about the encounter and Terry did so in a letter (5 RR 173; D.E. 20-12 at 63).

Terry testified that he had heard that BH's mother would sleep with high school students so he made contact with her and they had sex (5 RR 163-165, 180-184; D.E. 20-12 at 53-55, 70-74).  Terry did not tell his mother or any other adult about the encounter (5 RR 169-170; D.E. 20-12 at 59-60).  Terry testified that he had either been on probation or incarcerated since he was thirteen years old (5 RR 174-179; D.E. 20-12 at 64-69).  Petitioner's counsel was contacted by Terry who told him about the encounter.  Following the hearing, the court determined that the evidence was not admissible under Texas Rule of Evidence 608(b).[6]

Petitioner argues that Terry's testimony would have shown that BH's mother had bias, motive and an interest in having her daughter make an allegation against Petitioner.  He argues that a witness who is sleeping with her students would be strongly motivated to shine light away from herself and to portray her family as a victim of a sexual crime.

---

[6] "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence."  Tex. R. Evid. 608(b).

In *Van Arsdall*, the Supreme Court found that a defendant suffered a violation of the Confrontation Clause when he was not allowed to cross-examine a witness about the dismissal of a criminal charge against the witness after he agreed to talk to the prosecutor about the defendant's case.  *Id.* at 676.  Outside the presence of the jury, the witness testified that the charge had been dropped in exchange for his promise to speak to the prosecutor, but denied that the agreement had affected his testimony.  *Id.*  The trial court barred any cross-examination about the agreement, and also barred cross-examination of the witness about his having been questioned in an unrelated homicide.  *Id.*  The Supreme Court held that by "cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated the respondent's rights secured by the Confrontation Clause." *Id.*, 475 U.S. at 679.

Similarly, in *Davis*, defense counsel wanted to cross-examine a witness to show that he was on probation, with the goal of arguing that the witness could have testified against the defendant out of fear or concern of possible jeopardy to his probation.  The Supreme Court held that defense counsel should have been allowed to cross-examine the witness about his probation status.  *Davis,* 415 U.S. at 311.

Petitioner's case is distinguishable from *Van Arsdall* and *Davis*.  BH's mother was not on probation and was not under investigation for any crime at the time she testified about her daughter's outcry.  In fact, Terry testified that he had never told anyone about the alleged sexual assault.  Petitioner contends that BH's mother would have been motivated to distract attention from herself by reporting that her daughter had been

sexually assaulted, but there is no evidence in the record that any attention had been directed toward her.  Terry alleged that the incident occurred in October 2003 and BH's mother testified that her daughter told her about the assault in February 2006.  Petitioner presented no evidence from which a jury might have concluded that more than two years after allegedly having sex with an underage boy for which she was not being investigated, BH's mother felt compelled to fabricate charges against a third, unrelated person in order to draw attention away from herself.  Given the circumstances of this case Petitioner cannot show that his rights under the Confrontation Clause were violated when he was not allowed to introduce Terry's testimony to the jury.

### (2) GA's Mother

Petitioner also argues that his theory of defense was that GA wanted him out of the house and that she knew, based on her own grandfather having been convicted of child sexual abuse, that if she alleged that Petitioner had assaulted her, he would be removed from the home.  He contends that he should have been allowed to cross-examine GA's mother regarding her father's conviction in order to show that GA understood the ramifications of CPS becoming involved in one's family.  He claims that the jury was left with the impression that the family had no prior involvement with CPS and that GA was not familiar with the effect of making allegations of sexual abuse.

However, GA herself testified that she knew "a little bit" about CPS and also that she knew that if she reported abuse that the person she named as the abuser would be removed from the home and possibly go to jail (3 RR 77-78; D.E. 20-4 at 78-79).  In addition, when Petitioner's counsel questioned GA's mother outside the presence of the

jury, she said that she knew that her father was not allowed unsupervised visits with her children, but she did not know who had issued that rule (3 RR 263-264; D.E. 20-4 at 55-56).  Moreover, Petitioner's counsel had no evidence that CPS had been involved with GA's grandfather, which was the reason given by the court for not allowing him to cross-examine GA's mother in front of the jury (3 RR 265; D.E. 20-6 at 57).

Based on the record, Petitioner has failed to show that his rights under the Confrontation Clause were violated, or that he was prohibited from presenting a complete defense.  Accordingly, summary judgment should be entered for Petitioner on this issue.

### D.  Ineffective Assistance of Trial Counsel

To prevail on an ineffective assistance of counsel claim, a petitioner must meet the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  He must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable.  *Id.*, 466 U.S. at 687-88, 104 S.Ct. at 2064.  Petitioner must show "significant prejudice" in a noncapital context.  *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994)(citing *Spriggs v. Collins*, 993 F.2d 85, 88, n. 4 (5th Cir. 1993)).

Judicial scrutiny of counsel's performance must be highly deferential and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.  A court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  A petitioner must identify the

acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.*, 466 U.S. at 690, 104 S.Ct. at 2066.

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689-690, 104 S.Ct. 2052. . . . Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; . . . The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052.

*Harrington*, 131 S.Ct. at 788. In addition, federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). "When § 2254 (d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

### (1) Failure to Call Expert Witness, Rejection of Plea Agreement and Failure to Apprise Petitioner of Case Status.

The two-part *Strickland* standard applies to plea negotiations. In order to be entitled to habeas relief based on plea negotiations, a petitioner must show that his attorney's actions fell below an objective standard of reasonableness and that he was prejudiced. *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012). If a plea bargain has been

offered, a defendant is entitled to effective assistance of counsel in considering whether to accept it. *Id.* at 1387. If he does not receive effective assistance in that context, prejudice can be shown if the loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence. *Id.* A petitioner must show not only a reasonable probability that he would have accepted the plea bargain, but also that, "if the prosecution had the discretion to cancel it, or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented. *Missouri v. Frye*, 132 S.Ct. 1399, 1410 (2012).

Petitioner argues that his attorney misled him by telling him that he was going to hire an expert witness who would testify that that the girls were never assaulted, but never hired the expert and never told Petitioner about his change of plans. Because Petitioner believed the expert would testify and support his defense, Petitioner forewent consideration a plea bargain offer of forty years.

Petitioner made this argument to the state habeas court, which found, based on an affidavit by Cantrell, that he and Petitioner agreed that it would be more beneficial to hire additional counsel than it would be to hire an expert witness. *Ex Parte Gonzales*, WR-77,777-01, Event Date: 02/07/2013 at 11-12 (D.E. 21-15 at 15-16). Petitioner argues that the state court's finding was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner stated in an affidavit filed in the state habeas proceeding that he had paid Cantrell $25,000 to represent him and that Cantrell asked for an additional $10,000

to pay for a doctor to be an expert witness at trial.  Cantrell wrote Petitioner a letter

telling him that the doctor would be present at trial to testify that the girls were not

sexually assaulted.  Despite Cantrell's representation, he did not call an expert to testify.

Petitioner stated the following:

> Although I did not sexually assault these girls or do any of the things I was
> convicted of, had I been told that no expert would actually testify for me I
> would have at the very least considered a plea bargain.  I knew I was a
> facing a life sentence, but I also thought I was going to trial with a strong
> defense.  I knew that it was these girls (sic) words against mine, but I
> thought I was going to trial with an expert to back me up that I did not
> commit these crimes.
>
> After I was convicted I contacted Mr. Cantrell about what happened to the
> $10,000 that I paid him for the expert/doctor.  Mr. Cantrell agreed to refund
> me my half of the money, but only if I signed a contract.

*Ex Parte Gonzales*, WR-77,788-01, Event Date:  06/07/2012 at 170-171 (D.E. 21-18 at

77-78).

> In Cantrell's affidavit he stated the following:
>
> With respect to the additional ten-thousand dollars ($10,000) in fees, Mr.
> Gonzales and I agreed that additional counsel would be more beneficial
> than an expert witness due to the nature of this case.  I had discussed his
> case with a medical doctor, and I came to the belief that cross-examination
> of the SANE nurse would adequately discredit the medical testimony as
> alleged.   Mr. Gonzales agreed that secondary counsel should be hired.
> After the trial was over and his appellate process was exhausted, Mr.
> Gonzales asked me for help in hiring a Writ lawyer.  He did not have
> money to hire a Writ lawyer, and I agreed to give him a five-thousand
> dollar refund to help him in his attempts to hire a Writ lawyer.

*Ex Parte Gonzales*, WR-77,788-01, Event Date:02/07/2013 at 64-65 (D.E. 21-15 at 68-

69).

Representations to the court and opposing counsel cast doubt on the timing of Cantrell's decision not to hire an expert.  Cantrell indicated to the trial court on May 15, 2007 that he intended to call three medical expert witnesses to testify for Petitioner (2 CR 107-108; D.E. 19-4 at 6-7).  Two months later, on July 20, 2007, Moran entered an appearance as co-counsel (2 CR 136; D.E. 19-4 at 36).  Four days later, on July 24, 2007, Cantrell informed the court that he intended to call a doctor to testify on Petitioner's behalf and supplied the court with the doctor's curriculum vitae (2 CR 138-143; D.E. 19-4 at 37-41).  In addition, Cantrell wrote Petitioner a letter dated September 13, 2007 stating the following:

> We are prepared to go to trial on your case.  We have a doctor as an expert witness to testify that the girls were not sexually assaulted.  The District Attorney will have the Sexual Assault Nurse Examiner present as their expert witness.  We will confer with the District Attorney on a plea agreement other than the 40 years they were offering.  We have an established relationship with the District Attorney and we believe she will give us a better offer.

*Ex Parte Gonzales*, WR-77,788-01, Event Date:  06/07/2012 at 173 (D.E. 21-18 at 80).

Finally, during pre-trial proceedings on May 12, 2008, the day before the trial began, the prosecutor stated to the court "They have an expert and I have an expert for rebuttal."  When the trial court asked Cantrell if he had given the prosecutors his expert's curriculum vitae, Cantrell responded, "I gave the name of my doctor and address and phone number.  I don't have it yet, but as soon as I get it, I'll give it to you."  (2 RR 16-7; D.E. 20-2 at 17-18).

As part of his state habeas application, Petitioner submitted an affidavit from a private investigator who interviewed Jose E. Salinas, the physician Petitioner's counsel

identified in his pre-trial pleadings. According to the investigator, Dr. Salinas told him that he was retained by Cantrell to conduct a physical examination of Petitioner to determine the presence of any sexually transmitted diseases and to look for abrasions of the penis or any genital abnormalities. Dr. Salinas said he did not meet or examine either GA or BH and did not review their medical records. Dr. Salinas could not locate any of the records related to his discussions with Cantrell. *Ex Parte Gonzales*, WR-77,788-01 at 192-193; D.E. 21-18 at 99-100).

Respondent argues that Cantrell's decision not to call an expert was based on trial strategy and that may very well have been true. Nevertheless, nothing in the record indicates that Petitioner was informed that an expert was not going to appear on his behalf at trial. Cantrell states that he and Petitioner agreed that additional counsel would be more helpful than an expert, but Moran appeared in the case in July 2007 and Cantrell continued to represent to the trial court and opposing counsel that he was going to call an expert up until the day of trial in May 2008.

Notwithstanding Cantrell's statement to the contrary, the evidence shows that Cantrell did not make the decision to not call the doctor until trial had begun, but continued to represent to Petitioner, the court and opposing counsel that he intended to call a doctor to testify long after opposing counsel was hired. Based on the forgoing, the decision of the state habeas court that Petitioner and Cantrell mutually decided to not have a doctor testify at the trial is an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The question of whether Petitioner was prejudiced by Cantrell's actions is a much closer one.  The state habeas court did reach the prejudice issue and thus did not make a finding.  Nevertheless, in order to show prejudice, Petitioner must demonstrate that there was a reasonable probability that he would have accepted the plea offer.  A reasonable probability means "a probability sufficient to undermine confidence in the outcome.  *Strickland*, 466 U.S. at 694.  The standard is "less than a preponderance of the evidence."  *Dale v. Quarterman,* 553 F.3d 876, 880 (5th Cir. 2008).

Petitioner stated in his affidavit that he "would have at the very least considered a plea bargain," had he known an expert was not going to testify.  In *Arnold v. Thaler*, 484 Fed. Appx. 978 (5th Cir. 2013)(per curiam), a petitioner's attorney did not tell him about a 15-year plea bargain offer or a 25-year plea bargain offer in a timely manner and the petitioner was convicted and sentenced to life imprisonment.  At a hearing on a motion for new trial, the parties stipulated that the petitioner never received either offer from his attorney "and if he had done so, he would have considered it."  The prosecutor also testified that if the petitioner had accepted the offer before it was rescinded, she would have honored the agreement.  *Arnold*, 484 Fed. Appx. at 980.

In Arnold's federal habeas petition and also in an affidavit submitted to the district court, he stated unequivocally that he would have accepted the 15-year offer if he had known about it.  In his petition he alleged that he told his attorney that had he advanced the plea bargain offer of 15 years he would have accepted it because he was in a racist county and the odds were against him.  *Id.* at 982.  He claimed in his affidavit that he was "deceived into stipulating" the he would have merely considered, rather than accepted the

offer.  He said he misunderstood the meaning of the term and added, "When I stated 'considered', I  actually mean[t] that I would have definitely accepted the state's plea-bargain offer had the offer been related to me by [counsel]." *Id.* at 981.

The district court rejected Arnold's petition, finding that nowhere in his pleadings had he said that he would have accepted the plea deal as offered.  The Fifth Circuit reversed the decision, holding that the district court's finding was clearly erroneous based on Arnold's pleadings and affidavit.  The court remanded the case in order for the district court to address the issue of whether the 15-year plea offer would have been approved by the trial court.  *Id.* at 982 (citing *Lafler*, 132 S.Ct. at 1385).

In the instant case, the only statement by Petitioner regarding whether he would have accepted the plea offer is that he "would have at the very least considered a plea bargain."  His statement stops short of the unequivocal declaration in *Arnold* that the petitioner would definitely have taken the plea offer if he had known about it.  Saying that he would have "at least considered" a plea bargain does not create a probability sufficient to undermine confidence in the outcome of the case.  Accordingly, it is recommended that summary judgment be entered for Respondent on this issue.

### (2) Failure to Timely Challenge State's Expert

Petitioner argues that his attorney should have made a *Daubert* objection to the SANE nurse's testimony that eighty percent of the sexual abuse cases she sees present with no injuries at all.  The state habeas court found that Petitioner failed to show that if his attorney had made the objection, a *Daubert*  hearing would have been held and the nurse's testimony would have been found inadmissible.

Petitioner has not shown that the state court's determination is contrary to Supreme Court precedent.   Rather, Petitioner cites *Daubert* and then makes the conclusory allegation that if his attorney had objected in a timely manner, the testimony would have been excluded.   However, it is not uncommon for SANE nurses to testify that sexually abused children often do not show signs of physical trauma.  *See*, *e.g.*, *United States v. Bourgeois*, 537 Fed. Appx. 604, 628 (5th Cir. 2013);  *Woodring v. Director*, *TDCJ-CID*, No. 4:09cv486 at  *10, 2012 WL 3580821 (E.D. Tex. 2012); *Wiggins v. Thaler*, No. 3-10-CV-0061-P,  2010 WL 5093943 at *4 (N.D. Tex. 2010); *Williams v. State*, 305 S.W.3d 886, 890 (Tex. App. --Texarkana 2010, no pet.) and *Bargas v. State*, 252 S.W.3d 876, 885 (Tex. App. -- Houston [14th Dist.] 2008, no pet.). Nothing in the record or case law supports Petitioner's contention that if the court had held a *Daubert* hearing that it would have excluded the testimony.  Petitioner's arguments to the contrary are without merit and summary judgment should be entered for Respondent on this issue.

### (3) Failure to Object to SANE Nurse's Testimony Regarding GA's Truthfulness

At trial the SANE nurse testified that there was no physical evidence of abuse and she read into the record the statement GA made to her (4 RR 17;  D.E. 20-7 at 78). Petitioner argues that his attorney should have objected to the testimony as improper bolstering and his failure to do so constituted ineffective assistance of counsel. "Bolstering" has been defined as "any evidence, the *sole* purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without

substantively contributing 'to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.'"  *Rivas v. State*, 275 S.W.3d 880, 886 (Tex. Crim. App. 2009) citing *Cohn v. State*, 849 S.W.2d 817, 819-820)(emphasis in original)).

In *Owens v. State*, 381 S.W.3d 696, 706 (Tex. App. -- Texarkana 2012, no pet.) a defendant made a claim similar to Petitioner's--that in the absence of physical evidence, a SANE nurse's testimony about a victim's description of sexual assault was improper bolstering.   The state appellate court held otherwise, noting that the evidence was relevant and thus did not constitute improper bolstering simply because it corroborated testimony of an earlier witness.  The *Owens* court distinguished its holding from that of the court in *Salinas v. State*, 166 S.W.3d 368, 371 (Tex. App. -- Fort Worth 2005, pet. ref'd), where the appellate court found error in admission of a pediatrician's testimony that she diagnosed sexual abuse based on the child's description of the abuse.   The *Salinas* court found that the doctor vouched for the child's credibility because she based her diagnosis on the child's statement, whereas the SANE nurse in *Owens* reported the events of the examination and did not offer an opinion as to whether the child had been sexually assaulted.  *Owens*, 381 S.W.3d at 706 (citing *Salinas*, 166 S.W.3d at 371).  *See also Luttrell v. State*, No. 05-09-01036-CR, 2010 WL 3528531 (Tex. App. -- Dallas 2010, pet. ref'd)(no bolstering occurred when SANE nurse recounted complainant's statement about sexual abuse where complainant's credibility had been attacked and nurse offered no diagnosis).

In Petitioner's case, the nurse did not offer an opinion about whether GA was sexually assaulted, but merely recounted what happened during the examination.  Based on Texas case law, her testimony would not be considered bolstering.  Petitioner cannot show that if his attorney had objected the testimony would have been stricken.  Thus, he cannot show ineffective assistance of counsel.

Petitioner further complains that his attorney should have objected to the SANE nurse's testimony that she believes eighty percent of the children she examines.  The actual testimony is confusing:

> **Prosecutor**:  Okay.  So if eighty percent of the kids are sexually molested and don't have injuries, so you give it an eighty percent/twenty, then what the child told you is true.
>
> **Witness**:  Correct.

(4 RR 52; D.E. 20-7 at 53).  It is unclear what the prosecutor meant by the question and in any event, Petitioner has not shown that had his attorney objected there is a reasonable probability that the outcome of the case would have been different.

### (4)  Failed to Contact Witnesses

Petitioner argues that his attorney failed to contact a number of family members and friends, including women he dated who had children, and that the witnesses would have testified on his behalf if they had been contacted.  None of the witnesses he names were called to testify during the guilt/innocence phase of the trial and only his mother, Mary Gauna, and current wife were called to testify during the punishment phase.  *Ex Parte Gonzales*, WR-77,788-01, Event Date: 02/07/2013 at 170 (D.E. 21-18 at 77, 20-14 at 66).  In Cantrell's affidavit he stated that he contacted all potential witnesses named by

Gonzales, as well as Aaron Terry and GA's grandfather. *Id.* at 64 (D.E. 21-15 at 68). Moran stated that he had no knowledge of Cantrell failing to contact witnesses for Petitioner. *Id.* at 70 (D.E. 21-15 at 74).

The state habeas court found both attorneys' affidavits to be credible and determined that there was no evidence that Petitioner told the attorneys about any witnesses other than Terry and GA's grandfather. Nothing in the record contradicts this finding. Petitioner stated in his affidavit only that he had family and friends who could have testified on his behalf; he did not allege that he gave their names or contact information to Cantrell. In addition, with the exception of Petitioner's mother, none of the witnesses had any knowledge of the incident and all stated that they would have testified only to the fact that they believed Petitioner was innocent, that they had seen him interact well with the girls, or both. Gauna would have testified that GA's mother told Gauna that she did not believe the allegations but she was going to do what the "State people" told her to do because she was not going to lose her children (Affidavits of Oscar Gonzales, Sr., Mary Gauna, Phillis Ender, Eloy Gonzales and Jennifer Jonas; D.E. 5-4 through 5-6).

Petitioner must show a reasonable probability that the testimony would have changed the outcome of the case and he cannot do so based on the affidavits submitted by the uncalled witnesses, because none of them were present when the assaults took place. Only Gauna's testimony related to the circumstances of the case and any statement she offered regarding what GA's mother told her would have been subject to cross-

examination as well as rebuttal by GA's mother.  Accordingly, it is recommended that summary judgment be entered for Respondent on this issue.

### (5) Failure to Assert Due Process and Confrontation Clause Arguments and Failure to Impeach GA's Mother

Petitioner argues that his attorney should have objected on Due Process and Confrontation Clause grounds with respect to cross-examination of BH's mother and should have impeached GA's mother with respect to her family's prior involvement with CPS.  The same arguments have been made in this federal habeas petition and it is recommended that they be found to be without merit.  Thus, it is further recommended that a finding be made that counsel's failure to raise these arguments at trial did not constitute ineffective assistance of counsel because he would not have prevailed at trial or on appeal with either argument.

### (6) Conflict of Interest

Petitioner argues that his attorney had a conflict of interest because at some point prior to Petitioner's trial he had represented GA's grandfather in a child sexual assault case.  The prosecutor brought the information to the court's attention before trial, but the court did not inquire further about it.

Complaints of ineffective assistance of counsel based on attorney conflict of interest are analyzed under the standard set out in *Cuyler v. Sullivan*, 446 U.S. 335 (1980) and its progeny.  *Cuyler* permits a defendant who raised no objection at trial to recover upon a showing that an actual conflict of interest adversely affected counsel's performance.  *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000).  A petitioner does

not have to demonstrate prejudice as he would under *Strickland* to obtain relief.  *Cuyler*, 446 U.S. at 349-350.  However, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."  *Id.* at 350.

Petitioner in this case has not shown that his attorney actively represented conflicting interests.  Cantrell's representation of GA's grandfather occurred prior to his representation of Petitioner and nothing in the record indicates that Petitioner's interests conflicted with those of the grandfather.  The circumstances were unrelated to one another and Petitioner has pointed to no evidence showing that his defense was compromised by Cantrell's prior representation.  *Compare Glasser v. United States*, 315 U.S. 60, 75 (1942)(defense counsel failed to cross-examine prosecution witness whose testimony linked defendant with the crime and failed to resist presentation of arguably inadmissible evidence based on counsel's desire to diminish jury's perception of codefendant's guilt).  Therefore, it is recommended that summary judgment be entered for Respondent on this issue.

### E.  Ineffective Assistance of Appellate Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel on his first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 397 (1985).  Claims of ineffective assistance of counsel on appeal are analyzed under the *Strickland* standard. *United States v. Dovalina*, 262 F.3d 472, 474 (5th Cir. 2001).  However, the Constitution does not require an appellate attorney to advance every conceivable argument, regardless of merit.  *Evitts*, 469 U.S. at 394.

A reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). Where an attorney fails to adequately brief an issue on direct appeal, petitioner must show initially that the appeal would have had, with reasonable probability, a different outcome if the attorney had adequately addressed the issue. *Dovalina*, 262 F.3d at 474-475 (citing *Jones v. Jones*, 163 F.3d 285, 302 (5th Cir. 1998)). The petitioner must then show that the deficient performance led to a fundamentally unfair and unreliable result. *Id.* (citing *Goodwin v. Johnson*, 132 F.3d 162, 176 (5th Cir. 1997)).

Petitioner asserts that his appellate attorney raised four issues on appeal but did not sufficiently brief the arguments. The state habeas court found that Petitioner wholly failed to show that reversible error had occurred at trial and without doing so, he could not show prejudice under *Strickland*.

Petitioner does not show that the issues would have been decided differently had they been properly briefed on appeal. When addressing the sufficiency of the evidence argument, the appellate court noted that counsel had not specifically stated how the evidence was factually insufficient and had not challenged the specific offenses of which he was convicted. *Gonzales v. State*, No. 2010 WL 2543908 at *6 n. 10 and 11 (D.E. 21-15 at 35). Nevertheless, the court conducted a review and determined that the evidence was legally and factually sufficient to support the verdict. *Id.* at *7 (D.E. 21-15 at 36).

Similarly, the appellate court noted that Petitioner waived his ineffective assistance issue based on the failure to secure an expert witness because he did not

provide clear and concise argument with citation to authority support the assertion. *Id.* at *8 (D.E. 21-15 at 40). But the court reviewed the record and found it to be silent regarding trial counsel's reason for not securing an expert witness. The court concluded that, based on the record, Petitioner could not overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that the decision was sound trial strategy. *Id.* at 8 (D.E. 21-15 at 39-40).

The appellate court also found that counsel waived the argument regarding exclusion of evidence about GA's grandfather, but as discussed herein, it is recommended that the argument be found to be meritless. Thus, Petitioner cannot show prejudice based on insufficient briefing of that issue.

Finally, Petitioner claims that although his appellate counsel raised the issue of bias and prejudice on the part of the trial court, he cited to only three examples from the record and should have cited to more. The issue of trial court bias has been addressed at length herein and Petitioner failed to show bias under relevant case law. Thus, there is no basis for concluding that had appellate counsel cited to all the claims of bias in the record, that the outcome would have been different.

It is recommended that Petitioner's claims regarding ineffective assistance by his appellate counsel be dismissed and summary judgment entered for Respondent.

### F. Actual Innocence

Petitioner argues that he is actually innocent under the holding of *Schlup v. Delo*, 315 U.S. 298 (1995). In *Herrera v. Collins*, 506 U.S. 390 (1992), the United States Supreme Court reiterated the principle that federal habeas courts sit to ensure that

individuals are not imprisoned in violation of the constitution–not to correct errors of fact. *Id.*, 506 U.S. at 400. The court does not analyze the petitioner's guilt or innocence, but only whether his constitutional rights have been preserved. *Id.*

A claim of "actual innocence" comes into play when a petitioner otherwise subject to defenses of abusive or successive use of the writ seeks to have his federal constitutional claim considered on the merits. Under those circumstances, a petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Schlup*, 513 U.S. at 327 (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To establish probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of new evidence. *Schlup*, 513 U.S. at 327.

In *Schlup*, the Supreme Court noted that the claim of actual innocence made therein was different from the one in *Herrera*. The petitioner in *Herrera* advanced a claim of actual innocence to support the constitutional claim that the execution of an innocent person would violate the Eighth Amendment, whereas in *Schlup*, the constitutional claim was based not on the petitioner's innocence, but on ineffective assistance of counsel and withholding of evidence claims. *Schlup*, 513 U.S. at 313-314. Schlup's claim of innocence was part of his attempt to establish cause and prejudice for failure to present his evidence in support of his first federal petition. *Id.*, 513 U.S. at 314. He was seeking a gateway to have his otherwise barred constitutional claim considered on the merits. *Id.*, 513 U.S. at 315.

Petitioner in this case is not asserting that he is actually innocent in order to persuade the court to hear a claim which otherwise would be procedurally barred. Rather, he simply is arguing that he is innocent of the charges on which he was convicted and reiterates the constitutional arguments made earlier in his application. Such a claim is not cognizable in a habeas corpus proceeding. Accordingly, summary judgment should be entered for respondent on this issue.

## G.  Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A).  Although Petitioner has not yet filed a notice of appeal, the issue of whether he is entitled to a COA will be addressed.  See *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000)(a district court may sua sponte rule on a COA because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

Where a district court rejects the constitutional claims on the merits, the petitioner must show that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).
"A petitioner satisfies this standard by demonstrating that jurists of reason could disagree
with the district court's resolution of his constitutional claims or that jurists could
conclude the issues presented are adequate to deserve encouragement to proceed further."
*Miller-El*, 537 U.S. at 327.

A slightly different standard applies when the claims are dismissed or denied on
procedural grounds.  In that instance, a petitioner must show, "at least, that jurists of
reason would find it debatable whether the petition states a valid claim of the denial of a
constitutional right *and* that jurists of reason would find it debatable whether the district
court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484 (emphasis added).

In Petitioner's case, it is recommended that his claims be denied on the merits.
Reasonable jurists would not find the assessment of the constitutional claims debatable or
wrong.  If the district court orders that Petitioner's habeas petition be denied and
Petitioner seeks a COA in order to proceed with his case, it is further recommended that
the COA be denied because he has not made the necessary showing for issuance.

## RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Respondent's motion
for summary judgment (D.E. 28) be granted and Petitioner's application for habeas

corpus relief be denied.  It is further recommended that a Certificate of Appealability be denied.

Respectfully submitted this 22nd day of January, 2015.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).